Mr. Vargas asked the court to vacate his sentence and remand for resentencing because the district court used the incorrect method to calculate the loss for his base offense level, more than doubling his guidelines range. Mr. Vargas was convicted of fraudulently obtaining workers' compensation, a form of government benefits, but instead of applying the special government benefits rule to calculate the loss, the district court applied the general loss definitions and the general rule that actual or intended loss, whichever is greater, controls. This was error because the text and structure of note three to the commentary of 2B1.1 make it clear that the government benefits rule supplants the general rule. It's in a subsection F for special rules that apply notwithstanding subsection A, where the general rule and the general loss definitions are. And the government benefits rule focuses on the benefit an unintended recipient obtained or the benefits that were diverted to unintended uses. And then it also establishes a net difference calculation when there are cases of both improper and proper benefits received. And the rule says that it applies in any case involving government benefits, not just when there is a mixture, as the government argues in its brief. And that flows from the plain text of the commentary and also from this Court's case law. For example, in Dow, the Court applied the government benefits rule even though the entire amount of the benefits was fraudulent. Counsel at sentencing was Robert Gebbia? Yes. He filed a motion, I was just looking at this, for a downward variance? Yes, he did. And in that motion he says while the pre-sentence investigation report properly calculates Vargas's total offense is 22 and he has no criminal history, defendant requests variance? Yes, he does. So that's . . . how could that ever be plain error, fourth prong, if the defense attorney tells the district judge the guidelines are correctly calculated? Well, that's why we're on plain error. But is that really even plain error if he explicitly says pre-sentence report guidelines are properly calculated? It's not a . . . he didn't just miss it. He tells the court. He tells the court that they were properly calculated, but I don't think it would count as an intentional waiver because the defense attorney unfortunately missed that the loss method that the court and the government were using was incorrect. So it wasn't knowing. Do you think of any plain error case on a sentencing guidelines, factually or legally, where we would say miscarriage of justice even though the defense attorney told the court the really just reserved for ineffectiveness? So I think . . . I don't have a case for you off the top of my head. The government's not arguing it was relinquished. Right. They don't argue it was relinquished. I think it's because it wasn't a knowing relinquishment on behalf of the defense attorney. He doesn't object to the pre-sentence report. He acknowledges it was correct, but there's no delving into whether the method was correct or even whether . . . A tactical choice like, okay, I'll stick with whatever the guidelines because here are the reasons you should vary downward. He's an Air Force guy, blah blah. That's hard for us to say. Right, but I guess a tactical choice would go more into 2255 framework than where we're at right now. Are you saying this is a legal error or a factual error? A legal error because of the method of loss because our argument is that the government benefits rule actually establishes a different method for calculating loss, not only when there's a mixture of benefits, but also that the focus of the court should be on the benefits obtained or diverted. And of course in Nelson, the court also acknowledges that there is an intent to divert can count as intended loss and could establish a loss amount, but the court's focus then is still on what amount did the defendant intend to divert. And here we know that if the claim had been approved continually and if Mr. Vargas had lived until 80, then the loss amount, the pecuniary harm to the government would have been $850,000. But that doesn't tell us what did Mr. Vargas know about the process for the workers' compensation or how much he would continually receive every month. We know . . . I did check that box on the form. I hereby claim compensation for wages loss if disability continues beyond 45 days. Right. And in Nelson, when the court was trying to determine what the intent to divert was, there was a letter saying I support this company for some amount of a grant application. There wasn't a specific amount listed and there were other conditions that would have to be met in order for that company to receive the grant. And so the court said it was too speculative to determine how much loss Nelson intended to divert with that letter. Here on the form, we don't have a specific amount. We have compensation for wages loss. Garcia gives the amount and there was no objection this is speculative when she testified. Instead, Vargas gets up and he ends up with obstruction of justice for lying, which if the sentencing judge was the trial judge, right, it's a little hard to say, plain error of view, that once a guy's lying . . . Right. We don't have to necessarily believe what Mr. Vargas is saying. The burden is on the government to show by preponderance of the evidence he had this subjective intent. We don't know what conditions had to be met in order for the claim to be continually approved and even of the 66,000 that were paid out, we don't know how much went to cover his medical costs for those three surgeries and how much went to go for that schedule reward because he did have a schedule reward and then there's some unknown amount of a monthly payment after that that the human resource specialist calculated and testified about, but we don't have in the record any of that information. I guess what you're arguing by emphasizing speculative, I would have thought that's a fact error. You're saying there isn't a reference to 2B1.1. So the error was not applying the government benefits rule and that's playing from the language of the commentary in this court's precedent. Where I think the lack of evidentiary support comes into play is for whether it affected his substantial rights. And here there was 66,000 lost. That's proven because that's what happened. That's what he obtained. That's what was testified to. But that only gives him, I think, a 6-level increase. Instead they're using the 850,000 number which gives him a 14-level increase. And so that increase would have to be supported. And my argument is that if the court had used the right framework, the right method for calculating loss, there's a reasonable probability that number would have been different because the government wouldn't have been able to prove he specifically intended to cause that loss. Instead what the government was focusing on at sentencing was here's the possible loss to the government we've established with the human resources witness and there's no evidence he would have repaid it. That's a different question than whether he would have continually got it and whether he knew it to have that. That's not in the record. All we know is if the claim continued to be approved and if he lived until 80. These compensation claims, they're not approved for forever with no follow-up. They would periodically request medical verifications and things. These types of claims are not routinely approved forever. Right. And I looked at what I believe is the statute that would apply to this and it's 5 U.S.C. 8107 is the schedule award for the loss of a thumb. It would have been 72 weeks of two-thirds of his pay. Is that in the brief or in the record anywhere? That is not. After that, there is a compensation for wage loss, which is supported by the CA-1 form because that's what he's requesting. But I don't know, frankly, the calculations that go into that and it would seem like possibly wage earning potential in what he is making and how much, you know, it's a permanent disability, but he was still able to work and the record does show that he continued working at the same location and then after he was suspended there. So he was continuing to make money and try to earn back his wages. I might agree that it is extremely speculative that he would get this amount for the rest of his life until he retired or died. That's extremely speculative. The problem that has already been identified is if counsel affirmatively says there is no error, that is very different than everybody just forgetting and not realizing. Do you have any case where a counsel affirmatively said there's no error here and yet our court still found plain error? I believe there are cases, but I'm sorry I do not have one. I would be happy to submit a case in a 28-J after argument if the court is open to that. And I do think that under the fourth prong, this case warrants going back to the district court because of the big difference in the guidelines calculations and we don't know from what the court said at sentencing that the court would have applied the 51-month sentence if the guidelines . . . He didn't say anything like I would have gotten here anyway because this guy lied to me and he destroyed evidence? No, he didn't say that. I mean there are those unfavorable factors, but there are also the favorable factors of this is his first criminal offense. He served in the Navy, was a volunteer and very dedicated to his family. And so the court doesn't decide to vary downward, but the court didn't go as far as it would have reached the 51-month sentence, even if the guidelines had been lower. And I would think that if it had been pointed out, the missing pieces we . . . the pieces that are missing for his subjective intent to divert that amount of money. I mean it's very different than a case like Killen from the Eighth Circuit where the defendant had already been receiving monthly checks from Social Security of a certain amount. And so there the court said we can infer from that he knew he was going to keep getting this amount until he was 65. What Mr. Vargas said at sentencing, of course you can disregard it if you will, maybe the court did, but what he said was I didn't see that 66,000. After about five months, I did get some money because I had been without a paycheck, but it wasn't 66,000, it wasn't 30,000, and we don't know exactly how that money divvied up for . . . So you're not arguing a bright line . . . go ahead. I just . . . there's dicta which you identify, which talks about supplanting and superseding. You're not saying as a bright line rule it always supplants 2B1.1. You're saying here . . . you're saying here you wouldn't refer to it because there isn't sufficient basis to refer to it. But you could in some cases like Killen. Right. I interpret Nelson as saying the government benefits rule in subsection F allows for intent to divert. But we're not referring back to subsection A, the how intended loss is defended in terms of causing pecuniary harm. We are still in the government benefits rule of what funds were obtained and what funds were diverted. And even before the guidelines were amended to specifically say we're going to apply this difference method when there's a mixture of improper and proper . . . When the government benefits rule was in 2F1.1, it still talked about funds being diverted. And I think that's because of the type of thing that we're dealing with. The type of loss is a government benefit, that unilateral transfer of an applicant seeking some funds from the government, maybe not having a specific number in mind like here, but saying I qualify because of X, Y, and Z. Please do your calculations, government, and give me some money. And perhaps the commission realized that always using intended . . . the intent to divert would be a little too speculative in the run-of-the-mill government benefits case. And that's why I think the language focuses on obtained and diverted. I have a question about fourth prong. Why wouldn't we be well within our discretion to say we don't have to correct this error because of the conduct of your client? That that's a good reason why nobody would find us to be without the interest of justice and that sort of thing. Right. Well, I think my client's conduct is captured by the guidelines by the loss of acceptance of responsibility and the increase for obstruction of justice. So the guidelines already take into account that conduct. And if there were need for any upward variance, it certainly wouldn't be by 30 months. Anything else? I'll reserve my time for rebuttal. Good morning. May it please the Court. Good morning. I'll take the fourth prong. But you didn't argue in the brief. We didn't. And I don't think you even have to get to the fourth prong. I don't think it makes the second prong because I don't think that it's a clear or obvious error. Because as I read the court's cases about these kinds of losses, I don't understand, what is it, 3F2 to supersede entirely. Her argument seems more refined. You still would have to show he intended that $850,000. Ms. Garcia never spoke to his intent. She didn't speak to that, but he did when he was cross-examined. And he not only tried to get benefits from this, but when these types of benefits were cut off, he applied with the Texas Workforce Commission. I remember that. And lied to them. Can you quote from the cross where he says, you know, anything close to $850,000? I don't know that anybody had done an $850,000. So what's the factual basis for that? It's almost a million dollars being tagged onto this guy. But I, you know, Judge Elrod's suggestion is wouldn't that just be multiple future crimes? He's getting a ton of relevant conduct to drive his prison sentence here. Well, I don't know what's, there's nothing in the record that indicates how many times he's going to have to reconfirm or reapply. What I understand that additional benefit to be is that was a benefit basically like a disability benefit because of the loss of a limb. That's what Luisa Garcia testified to. I know mechanically, but you have to show intent that he intended it. And what's, I mean, it was in the PSR, paragraphs 9 and 16. He doesn't object to PSR. He doesn't object to sentencing. We have a big plain error problem, but it might be plain error if it's pure speculation. Now, then you get the problem. Which is different from the methodology. Yeah, it is different than the methodology. I agree. And I'm looking first at the methodology. Well, let's say you persuaded me on the methodology, but I guess where is there any proof if you're not relying on the attorney's statement that we think this is just right? Well, I think that what the district court did is he could find from the circumstances, first of all, the overall nature of the conduct. He was involved, it appears, it's not established, but he was stealing copper for a long time. I think the district judge could find. It was over 3,600 pounds of copper over almost a six-year, seven-year period. So he's got that kind of intent working for him. Then he's got the circumstance where he cuts his thumb off. He fabricates a crime scene or fabricates an accident scene. He enlists somebody to go get the evidence for him. All of that, and then he applies for these benefits. Now, I don't know that he sat down on his head and figured out, let's see, if I do this until 80, I'm going to come up with 850. But you have to rely on the only thing that reflects his intent is the form itself, right? And he certifies, signs, dates it, and it gets a little bit towards this will keep going as long as I have the disability. Is that the primary piece? I think that's the primary piece, and then you add to that that he tried to get benefits from another entity after that. He went to the Workforce Commission, and he lied to them. He lied to them about whether or not there were even charges still pending against him. And I think Judge Elrod, you mentioned, what about just the conduct in this case? And what comes to my mind is the one definition of chutzpah is the guy who kills his parents and then pleads mercy because he's an orphan. You didn't argue that to us. You argued this technical point to us, which, you know, who am I to say that Nelson does stand for a strict government benefits rule, but it appears that it does. And that's the argument you made to us was not this argument on the fourth prong. We didn't, but you've asked about it. I'm responding to it. I know. But we can take that into consideration. It's discretionary. We can take into consideration that you didn't argue that. We can take into consideration that he did behave that way in his sentencing. We can take all of that into consideration in the fourth prong. It's a very wide discretion. But what is the error then? The error is not using the government benefits rule to override. It does have within it about the intended loss. But the government benefits rule, you should use the specific rather than the general when you start out to analyze this problem. And there is no fact that he would go on to $800,000. And then also that certainly prong three is satisfied if prong two is satisfied because it's 15 months to go up to, I have it written down. It goes 41 to 51. It goes 41 to 51. The third prong is totally satisfied. There's no question. So it's just a, do you think it was clear under second prong, and do you do fourth prong on this record where there is perhaps a concession by the, definitely a concession by the counsel? Right. And I, to answer the second prong, I don't think it's a clear or obvious error because I think that the calculation methodology was appropriate. You don't think it's an error at all. Well, it might be an error if the court concludes ultimately that the methodology is that somehow 3F supersedes. You're saying that language is just dicta, which is wrong. It doesn't supplant. It doesn't subcede. It's a floor, right? I don't know what the court was meaning in those contexts because as I look at Nelson, ultimately the question was one of credits, the application of 3E, and the same true of Harris. The trouble with all these guidelines that we get is that the rule 32 tells everybody if you're going to disagree about a fact, there are all these times to do it. And then people don't. Now that I'm suggesting to you that they file a motion saying the guidelines are correct, is there any doubt in your mind that the actual standard of review would be there is not? It's relinquished. That it's forfeited basically? It's not forfeited. He said no, the guidelines are right. Does the government sort of perceive that or do you think I'm wrong on that? I don't think you're wrong. I guess I just look at it from a practitioner. We make mistakes and do stupid things sometimes, and I don't know that that necessarily precludes this court from looking at it to make sure that there's not a miscarriage of justice. But I don't think that's what happened in this case. I don't think that's really what's on the line here. And where I start is the starting point is I think if you address the question of the methodology, I don't think that 3F excludes all of 1A. You've got to have some basis in what the benefits rule does. It's a difference calculation. It doesn't even address the question of whether the loss is actual or intended. And if you look through those circumstances, one is for stolen counterfeit credit cards. What that rule does basically is it comes up with a liquidated loss amount, $500 per card. The Ponzi fraud, as I understand that one, you can still look to actual or intended losses. It's another one of those differences. You don't get a credit because some investors made money on this. He gets $66,000 about because of the exact crime. But his intention is he was devious and planned the whole thing to get a lifetime of benefits. His intent went beyond that. But it's got to be that there's some factual support for it, and that was the primary portion of the argument. That's right. And the factual support, I mean, it's what it is in there. I don't have anything else. I looked for Government Exhibit 115, which wasn't offered, because it would be nice to know how that calculation was made. But the best I can infer from Ms. Garcia's testimony is she's got a schedule for loss of a thumb. If that's what you are and this is your age, this is what the projection is out to age 80. I don't know where 80 comes from, but I understand it to be a disability. It's not simply a worker's compensation. It's a disability that he gets for the remainder of probably what his actuarial lifetime is. He was, I think, in his early 50s at the time this occurred. That's what the evidence is together with, if you look at the nature and circumstances of the multiple crimes that he committed, that he was stealing from the government, plus he was trying to cover it up with a claim for benefits, plus he was trying to get those benefits, plus he went to the Texas Workforce Commission to try to get more benefits when these were cut off. And he lied to them. It's a disability if you do go back at a certain level, and there's some indication that he was working. And so that gets adjusted. You know, for a while they'll maneuver your disability with your job, but then eventually your disability cuts off if you go above a certain amount. And we don't know what above a certain amount he would ever do. It's all speculative. No, we don't know because he didn't challenge it. He said that the methodology is correct. He didn't challenge the $850,000. He accepted it. And we had on the stand a witness who he could have cross-examined about that. He could have asked those questions, but he didn't. And that's what the district court came up with. It may not be $850,000, but the cutoff for this upward adjustment was $550,000. It was for an amount higher than, so give him $300,000 over his lifetime. He's still in that range. He's still in that range of 41 to 51 months. And it's not an inappropriate sentence under the circumstances, and I think the district court considered it because he listened to the argument for the variance and said, no, I find that you stole it, I find that you lied about it, and I'm not going to give the variance. I believe counsel mentioned a statute. Are you familiar at all with whether out there he would have to reapply to keep getting it? I don't know. I do not know that. I can't share any expertise on that. Do you have anything further? Not if you don't have any further questions. Thank you very much. Thank you. Ms. Kimmelman, you saved time for rebuttal. Thank you, Your Honors. To talk a little about Mr. Vargas's experience with workers' comp, he did mention at sentencing that in the past when he had a hearing problem, he applied for workers' comp and he got hearing aids. He had a problem with his knee. He applied for workers' comp and he got that covered. Those experiences wouldn't have led him to believe that there would be some windfall amount of a monthly payment, and so that just goes, again, to show the lack of information about a specific intent to cause some funds to be diverted. Counsel pointed out the other subsections under F. They are under that heading of notwithstanding A, and so what that to me signals is don't look at A first, look at this. And in some cases, those rules do supplant a loss calculation, and that's what I think happens with government benefits rule, and that's what this court has said in dicta. There are others where you'd have to look outside of that specific rule. Some, I think like the Ponzi scheme one, are about not accrediting what was returned to investors, and so there would have to be also some looking to the rest of the subsections of note F to determine what that loss is, but I think that still comports with our reading of the special rule and the government benefits rule, especially given how this court has interpreted it in its prior cases. And I think in the briefing there was some mention about the not less than language of the government benefits rule and it's suggesting that that meant, okay, we can do intended loss because it means not less than. I think less than definitely shows the rule is a floor, not a cap, but I don't think that means revert to A. Did the circuit apply the methodology you say to actually reverse a sentence that was premised on intended loss? I have not seen a reversal like that. The case I was thinking of that goes along with what I was saying was Hebron from this court where there was a mixture of improper and proper FEMA reimbursements, and it was too difficult for the court to discern what's proper, what's improper, and because that defendant's fraud was so pervasive, the court said the reasonable estimate of this loss is going to be what he requested reimbursement from FEMA, even if it includes some proper benefits. And so that to me is an example of the not less than being a floor and it being okay to include a little bit more if it's just too difficult. And it's still, you know, under subsection C, a reasonable estimate of the loss. And so that— You see, I mean, my problem, put aside the motion your predecessor counsel filed, what's in the state of mind of a defendant? He has to assert it somewhere. He didn't assert it when he testified. He didn't cross the government witness that says 850. Then it's in the PSR in two paragraphs. He doesn't attack it. Then he gets to sentencing. He doesn't attack it. So a district judge says, okay, I'm going with that number. It's really hard to say on appeal, well, there's no evidence to support. Right, right. About the cross-examination, I could see the defense attorney not going there because it's a different question at trial, you know, for the jury to answer, and that's where Ms. Garcia testified was at trial. But that certainly doesn't excuse not attacking the amount that then is used at sentencing. And I unfortunately don't have an explanation for, you know, why that wasn't done. It should have been done. You know, had it been done, I think there's a reasonable possibility that the sentence would have been lower. And to me, looking at Mr. Vargas and with his conduct but also with his history of service, I think that he deserves a shot at resentencing because otherwise it feels like a miscarriage of justice to me to let someone be sentenced under the wrong rule with no one asking the right questions and giving him top of the guidelines. Am I correct that this would not be dischargeable in bankruptcy? That is a question I do not know the answer to. Yeah. He has $850,000. How is that collected? What percentage? Well, so the restitution was actually the $66,000 plus the $500,000 value of the copper. So it still is a large sum of money. But, you know, he said at sentencing he would work on repaying it once he gets out of prison. He is still employable. He'll work at paying that, and it will go through the regular restitution process. And that's something notable, that the court applied the correct restitution, which is a strict rule about what you've lost, and it's a much lower amount. Right. You have to be paid back. Yes. And so for those reasons we ask for remand for resentencing. Thank you.